# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# SHREVEPORT DIVISION

| FRANK V. SAVAT | * | CIVIL ACTION NO. 07-1752 |
| --- | --- | --- |
| VERSUS | * | |
| MICHAEL J. ASTRUE, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE HAYES |

### MEMORANDUM RULING

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. Pursuant to 28 U.S.C. § 636(c)(1) and with the consent of all parties, the district court referred the above-captioned matter to the undersigned magistrate judge for the administration of proceedings and entry of judgment. For reasons assigned below, the decision of the Commissioner is **AFFIRMED**, and this matter **DISMISSED** with prejudice.

### Background & Procedural History

Frank V. Savat, Jr. filed the current application for Title II Disability Insurance Benefits on January 16, 2003. (Tr. 160-162).[1] He alleged disability since April 3, 1995, due to a herniated disc, fibromyalgia, and depression. (Tr. 160, 168). The claim was denied at the initial stage of the administrative process. (Tr. 142, 153-156). Thereafter, Savat requested and received a March 12, 2004, hearing before an ALJ. (*See*, Tr. 390). However, in a May 28, 2004, written decision, ALJ Thomas Bundy found that Savat was not disabled under the Act. (Tr. 387-396).

---

[1] An Administrative Law Judge ("ALJ") denied a prior application for Disability Insurance Benefits on April 3, 1997; it was not further pursued. (*See*, Tr. 27).

Savat appealed the adverse decision to the Appeals Council, which granted the request for review, vacated the ALJ's decision, and remanded the case for further proceedings. (October 15, 2004, Order; Tr. 405-408). Upon remand, a new hearing was held on June 6, 2005, before ALJ Charles Lindsay. (Tr. 86-132). However, in a July 27, 2005, written decision, the ALJ found that Savat was not disabled under the Act. (Tr. 436-448). Savat appealed the adverse decision to the Appeals Council, which again granted the request for review, vacated the ALJ's decision, and remanded the case for further proceedings. (*See*, March 3, 2006, Order, Tr. 454-457).

Upon remand, new hearings were held before ALJ Bundy on March 1, 2006,[2] and November 1, 2006. (Tr. 39-85). Nevertheless, on December 13, 2006, the ALJ determined that Savat was not disabled under the Social Security Act, finding at Step Five of the sequential evaluation analysis that he was able to make an adjustment to other work that exists in substantial numbers in the national economy. (Tr. 24-38). Savat appealed the adverse decision to the Appeals Council. This time, however, the Appeals Council denied Savat's request for review; thus the ALJ's decision became the final decision of the Commissioner. (August 24, 2007, Notice; Tr. 9-11).

On October 24, 2007, Savat sought review before this court. He alleges several errors which can be categorized as follows,

1) the ALJ erred in his analysis at Step Two of the sequential evaluation process, because he failed to recognize all of plaintiff's severe impairments;

2) the ALJ's residual functional capacity assessment is not supported by substantial evidence; and

---

[2] This hearing date precedes the Appeals Council's remand order. Although the hearing transcript is dated March 1, 2006, it is likely the transcript from the March 12, 2004, hearing, which does not otherwise appear in the record.

3) the ALJ's Step Five determination is not supported by substantial evidence.

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. While substantial evidence lies somewhere between a scintilla and a preponderance, substantial evidence clearly requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). Conversely, a finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Secretary. *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

## Determination of Disability

Pursuant to the Social Security Act (the "Act"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a

physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the Act utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the Act. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the Act. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

   (1)   An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

   (2)   An individual who does not have a "severe impairment" of the requisite duration will not be found to be disabled.

   (3)   An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

   (4)   If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

   (5)   If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make

an adjustment to other work in the economy.
*See, Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## Analysis

Savat remained insured for Title II disability benefits only through December 31, 2000. (Tr. 28). Thus, disability must be established on or before that date. *Id*. Also, because an ALJ denied Savat's prior application on April 3, 1997, the relevant period begins on April 4, 1997.

### I. Steps Two and Three

The ALJ determined at Step Two of the sequential evaluation process that Savat suffers severe impairments of herniated nucleus pulposus, L-5/S1, degenerative disc disease, fibromyalgia, and depression. (Tr. 30, 37). He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at Step Three of the process. *Id*.

Plaintiff contends that the ALJ erred because his decision purportedly failed to consistently list his severe impairments. On page two of his decision, the ALJ recited plaintiff's alleged impairments of herniated disc, fibromyalgia, and depression. (Tr. 28). Thereafter, in the

5

body of his decision and in his findings, the ALJ determined that Savat suffered from severe impairments of herniated nucleus pulposus, L-5/S1, *degenerative disc disease*, fibromyalgia, and depression. (Tr. 30, 37) (emphasis added). It is manifest, however, that the ALJ initially recited the impairments alleged by plaintiff on his application. (*See*, Tr. 28, 168). The ALJ did not determine plaintiff's severe impairments until later in his decision, which he consistently applied thereafter.

Plaintiff further contends that the ALJ's Step Two determination omitted other impairments such as pain, depression, and learning/cognitive disorders. "Pain, alone or in conjunction with other impairments, may be disabling, and the [Commissioner] is obliged to weigh subjective evidence of its existence." *Dellolio v. Heckler*, 705 F.2d 123, 127 (5th Cir. 1983) (citations omitted). In assessing the severity of an impairment, the Fifth Circuit has determined that "an impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000).

The court observes that the ALJ *did* determine that plaintiff's depression constituted a severe impairment. (Tr. 30, 37). Moreover, to the extent that plaintiff urges generic pain and learning disorder as severe impairments, such omission is not critical when, as here, the ALJ has determined that the claimant suffers at least one severe impairment. At this point, the ALJ must proceed to consider all medically determinable impairments and their effects in the remaining steps of the sequential analysis. 20 C.F.R. §§ 404.1523 & 416.923. In fact, the ALJ specifically observed that once it is determined that a severe impairment exists, all medically determinable

6

impairments must be considered in the remaining steps of the sequential analysis. (Tr. 29). The critical issue is whether the ALJ's residual functional capacity assessment is supported by substantial evidence.

## II. Residual Functional Capacity Assessment

The ALJ determined that Savat retained the residual functional capacity to perform light work reduced by moderate limitations in the ability to understand, remember, and carry out detailed instructions and make judgments on simple work-related decisions. (Tr. 34, 37).[3] Savat also suffers slight limitations in his ability to: interact appropriately with the public, supervisors and coworkers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. *Id*.[4]

### a) Physical RFC

Plaintiff contends that the ALJ's determination that plaintiff retained the exertional capacity for a full range of light work is undermined by his testimony and the medical record. He

---

[3] Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

[4] The ALJ defined "moderate" as moderately limited, but still able to function satisfactorily. *Id*. Slight is defined as a mild limitation, but generally able to function well. *Id*.

7

refers, for example, to Larry Broadwell, M.D., who examined plaintiff almost one year after the relevant period. (Tr. 232-235). During the examination, Savat reported that his former employer had promised to take care of him, but had since reneged on the promise. *Id*. Savat stated that it was a big disappointment and letdown, but that it would not be a problem if he were able to work. *Id*. Broadwell diagnosed low back pain with degenerative disc disease of the lumbar spine; discogenic etiology of back pain with history of herniated disk; fibromyalgia; and degenerative disk disease of the cervical spine with neck pain. *Id*. Broadwell believed that employment at the light duty level might be possible, with a sit/stand option to avoid prolonged sitting. *Id*.[5]

On, or about July 12, 2002, Savat underwent a functional capacity evaluation which concluded that he was capable of full-time work at the light physical exertional level. (Tr. 243-256). The physical therapist stated that Savat perceived himself as suffering from a severe disability which was not consistent with the evaluation. *Id*. The physical therapist stated that he would do best with a job that allowed him to frequently change position. *Id*. Stooping should be occasional, and he should not squat, kneel, or climb ladders. *Id*.[6] A previous functional capacity

---

[5] Dr. Broadwell's examination contains the earliest reference of a cervical impairment. Although, contemporaneous x-rays confirmed cervical issues, there is no evidence that plaintiff complained of cervical problems prior to the date that he was last insured, almost one year earlier. Moreover, despite recognizing the cervical impairment, Dr. Broadwell did not assign any additional limitations due to this impairment. Based upon his one-time examination in 2001, Broadwell wrote a subsequent medical report on February 18, 2003, stating that Savat was restricted to lifting 25 pounds. (Tr. 237). Broadwell further stated that he could not frequently bend his neck or back, and had restrictions on prolonged sitting, standing, or walking. *Id*.

The record also reveals an April 21, 2003, evaluation by a pain care specialist, Ross Nelson, M.D. (Tr. 478-481). However, Nelson did not assess plaintiff's limitations, and his evaluation does not focus upon the relevant period at issue.

[6] However, Savat believed that he could occasionally squat and kneel. (Tr. 255).

evaluation indicated that Savat was capable of full-time work at the light exertional level. (Tr. 245). Also, a January 29, 2003, Narrative Report from Savat's chiropractor indicated that he could not perform repeated bending, lifting, stooping, or prolonged sitting or standing. (Tr. 276-277). However, the report did not mention a cervical impairment. *Id.*[7]

Of the various medical sources that addressed plaintiff's physical residual functional capacity, only Savat's treating orthopedist, Austin Gleason, M.D., examined him during the relevant period. Moreover, during that time, plaintiff saw Dr. Gleason on only five occasions, and his complaints were limited to low back pain. (Tr. 213-217). At his most recent visit just four days before his eligibility for benefits expired, plaintiff described lower back pain that radiated to his left leg and that it "comes and goes." (Tr. 213). In a July 10, 2001, Progress Report, Dr. Gleason wrote that he first began seeing Savat in March 1995. (Tr. 211). Gleason stated that in 1995, he diagnosed plaintiff with herniated disc, extrusion at L5-S1 on the left side, and recommended surgery. *Id*. He noted that he had last seen Savat on December 27, 2000, when he was still complaining of leg pain. *Id*. Gleason reviewed a labor market survey conducted by Cigna, and opined that plaintiff could perform four out of the twelve jobs listed, which were identified at the sedentary and light exertional levels. *Id*.

---

[7] The court observes that physical therapists, like chiropractors, are not "acceptable medical sources" under the regulations. 20 C.F.R. § 404.1513(d) & 416.913(d). Moreover, only "acceptable medical sources" can provide "medical opinions" to show the severity of a claimant's impairment and how it affects her functional ability. 20 C.F.R. § 1527(a)(2) & 416.927(a)(2). Although the ALJ is required to consider evidence from "other sources" when evaluating an "acceptable medical source's" opinion, "the fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because, . . . 'acceptable medical sources' 'are the most qualified health care professionals.'" SSR 06-03p. *See also, Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991) (recognizing that the regulations accord less weight to other sources such as chiropractors than to medical doctors).

9

On January 14, 2004, Dr. Gleason sent a letter to plaintiff's attorney wherein he agreed that from an orthopedic standpoint, Savat could work at the light or sedentary level. (Tr. 364-365). Due to Savat's vocational factors and mental impairments, however, Gleason concluded that he had been disabled since 1995, and would require extensive training to make an adjustment to other light or sedentary work. *Id*. Of course, a physician's statement that a claimant is disabled or unable to work is accorded no special significance under the regulations. 20 C.F.R. § 404.1527(e)(1); *Frank v. Barnhart*, 326 F.3d 618 (5th Cir. 2003). Moreover, whether Savat would be able to make an adjustment to other work is outside of a physician's expertise; it remains an issue for the vocational expert.[8]

Plaintiff also contends that the ALJ failed to account for his complaints of pain. Of course, pain is considered disabling under the Social Security Act only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Selders v. Sullivan*, 914 F.2d 614, 618-619 (5th Cir. 1990). The ALJ's decision as to the credibility of plaintiff's complaints of pain is entitled to considerable judicial deference if supported by substantial evidence. *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991). Factors that the ALJ may consider in evaluating the claimant's subjective complaints include: (1) claimant's daily activities; *Falco v. Shalala*, 27 F.3d 160 (5th Cir. 1994); *Anthony v. Sullivan*, 954 F.2d 289, 296 (5th Cir. 1992); *Reyes v. Sullivan*, 915 F.2d, 151, 155 (5th Cir. 1990); (2) medication the claimant takes for pain; *Anthony v. Sullivan, supra; Villa v. Sullivan,* 895 F.2d 1019, 1024 (5th Cir. 1990); (3) degree of medical treatment; *Villa v. Sullivan, supra; Nickerson v. Secretary of Health and Human Services*, 894 F. Supp. 279 (E.D. Tex. 8/3/1995)*;* (4) lack of

---

[8] Gleason's records during the relevant period do not reference any mental impairment.

medical opinions in the record indicating the claimant is precluded from performing the level of activity indicated by the ALJ; *Villa v. Sullivan, supra;* and (5) external manifestations of debilitating pain such as marked weight loss. *Falco v. Shalala*, 27 F.3d 160 (5th Cir. 1994); *see also* 20 C.F.R.§§404.1529(C)(3)(I)-(vii), 416.929(c)(3)(I)-(vii) (1993).

In this case, the ALJ carefully considered plaintiff's complaints of pain and found that his impairments could reasonably cause his alleged symptoms. (Tr. 32). However, he did not credit Savat's allegations regarding the severity of the symptoms. *Id*. Nonetheless, due to his impairments, the ALJ reduced plaintiff's residual functional capacity to the light occupational base. There is substantial record evidence that the ALJ's residual functional capacity assessment accommodated plaintiff's impairments and their effects. *See*, discussion, *supra*; *Story v. Astrue*, Docket No. 08-10234 (5th Cir. Sept. 30, 2008) (unpubl.) (ALJ fulfilled obligation to make explicit credibility findings when he considered claimant's allegations and found them inconsistent with the medical evidence).[9]

In his assessment, the ALJ clearly credited the limitations recognized by plaintiff's treating orthopedist, Dr. Gleason. As the fact finder, the ALJ enjoys the "sole responsibility for weighing the evidence and may choose whichever physicians' diagnosis is most supported by the record." *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) (citing *Bradley v. Bowen,* 809 F.2d 1054, 1057 (5th Cir.1987)). Here, he favored the assessment of the physician that had a longitudinal appreciation of plaintiff's condition, and who saw plaintiff during the relevant

---

[9] There is evidence that plaintiff exaggerated his symptoms. *See*, discussion, *infra*.

11

period.[10]

### b) Mental RFC

There is no question that by 2002-2003, Savat's depression imposed severe work-related limitations. The issue, however, is whether these limitations existed during the relevant period, i.e. prior to 2001. In this regard, "[a] claimant is eligible for benefits only if the onset of disability began on or before the date the claimant was last insured." *Ivy v. Sullivan,* 898 F.2d 1045, 1048 (5th Cir. 1990). The claimant bears the burden of establishing a disabling condition before the expiration of his insured status. *Id.* Social Security Ruling 83-20 outlines the policy and procedure by which the Commissioner should determine the onset date of a disability. SSR 83-20 (1983). "Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence." *Id*. With slowly progressive impairments such as depression, "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." *Spellman v. Shalala*, 1 F.3d 357,

---

[10] Even if the court were to accept plaintiff's argument that the ALJ should have credited some of the additional restrictions identified by Dr. Broadwell and the other sources, any error was harmless. *See, Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (ALJ's omission does not require remand unless it affected claimant's substantial rights). During a prior hearing, ALJ Lindsay (and plaintiff's counsel) posited hypotheticals to a vocational expert ("VE") that incorporated additional physical limitations such as the ability to only occasionally perform postural activities and the need for a sit/stand option, but the VE opined that there were jobs that existed in substantial numbers in the national economy that plaintiff could perform despite these additional restrictions. (Tr. 119-132). The hypotheticals included mental limitations consistent with the instant ALJ's residual functional capacity assessment. (*See*, Tr. 123-124, 130).

VE testimony from a prior hearing may properly support the Commissioner's decision when, as here, the claimant had an opportunity to cross-examine the expert. *See, Sonnier v. Shalala*, 51 F.3d 1045, 1995 WL 153415 (Mar. 29, 1995) (unpubl.); *Sherman v. Astrue*, 233 Fed. Appx. 705 (9th Cir. May 25, 2007); *Wolfe v. Chater*, 86 F.3d 1072 (11th Cir. 1996); and *Thibaut v. Astrue*, 2008 WL 4510033 (M.D. La. Oct. 2, 1998).

362 (5th Cir. 1997) (quoting, SSR 83-20). In such cases, "when the medical evidence regarding the onset date of a disability is ambiguous and the [Commissioner] must infer the onset date, SSR 83-20 requires that that inference be based on an informed judgment. The [Commissioner] cannot make such an inference without the assistance of a medical advisor." *Spellman*, 1 F.3d at 362.

In this case, the ALJ employed the services of a psychiatrist, Barbara Felkins, M.D., to assess the effects of plaintiff's mental impairment. In response to interrogatories dated June 1, 2006, from the ALJ, Felkins opined that Savat met Listing 12.04. *Id*. She also completed a medical source statement which indicated marked and moderate limitations of functioning. *Id*. However, the interrogatories and her responses thereto did not set forth the relevant period at issue. Accordingly, on July 10, 2006, the ALJ submitted additional interrogatories to Dr. Felton, which clarified the relevant period at issue. (Tr. 574-579). This time, Felton specified that plaintiff did not meet Listing 12.04 until October 10, 2002. *Id*. Prior to that time, she opined that his mental impairment imposed only moderate and slight limitations of functioning – limitations which were ultimately adopted by the ALJ in his residual functional capacity assessment. (Tr. 580-581).[11]

Plaintiff contends that the ALJ erred when he credited Felton's, a non-examining physician, assessment of the temporal progression of a claimant's impairment over the

---

[11] Plaintiff contends that the focus of Dr. Felton's review was whether or not plaintiff met a listing during the relevant period. While Dr. Felton's review was unquestionably directed at the Step Three inquiry, she also addressed the Step Two inquiry and plaintiff's mental residual functional capacity. (Tr. 574-581).

13

assessments rendered by two examining, consultative physicians.[12]  Ordinarily, plaintiff's

argument would be well-taken.[13]  Here, however, the issue is not plaintiff's condition at the time

---

[12]  In support of his argument, plaintiff touts the findings of two consultative psychologists, James Pinkerton, Ph.D., and Gary Milford, Ph.D.  The former psychologist examined Savat on February 24, 2005, at the request of Disability Determination Services.  (Tr. 424-428).  Pinkerton observed that Savat ambulated without gross difficulty.  *Id*.  Pinkerton remarked that Savat openly endorsed psychological distress at a magnitude suggesting possible exaggeration.  *Id*.  Pinkerton concluded that the report reflected a reasonable representation of Savat's emotional functioning in the context of possible exaggeration.  *Id*.  During the evaluation, Savat stated that he placed a pistol to his head a few times about three years earlier.  *Id*.  He also self-inflicted wounds to his head when he becomes frustrated or upset.  *Id*.  He stated that he did not feel like working because he was depressed all of the time, and did not like to be around people.  *Id*.  Savat reported a history of depression going to back to 1985.  *Id*.  He nonetheless was able to sustain concentration, and was capable of making independent decisions.  *Id*.  His overall intellectual skills were measured to be in the low average range.  *Id*.  Pinkerton diagnosed major depressive disorder, severe; panic disorder without agoraphobia; and pain disorder.  *Id*.  He assigned a current GAF of 50.  *Id*.  Pinkerton did not believe that Savat was motivated to pursue employment opportunities at that time.  *Id*.  He remarked that Savat had established a routine without employment for the past ten years.  *Id*.  Pinkerton concluded that Savat suffered numerous, marked limitations of functioning which were thought to have lasted for ten years and were expected to continue, absent effective psychiatric treatment.  *Id*.  Pinkerton also completed a medical source statement of ability to do work-related activities (mental).  (Tr. 429-431).

On September 7, 2006, and 21, 2006, Gary Milford saw Savat for a psychological evaluation.  (Tr. 592-599).  Milford diagnosed major depression, recurrent; alcohol abuse; generalized anxiety; and somatoform features.  *Id*.  Milford remarked that Savat viewed himself as a victim and that he had bonded himself to that story.  *Id*.  Milford concluded that Savat was not employable.  *Id*.

On October 20, 2006, plaintiff's attorney sent Dr. Milford a copy of Dr. Pinkston's evaluation and medical source statement.  (Tr. 584-587).  Milford reviewed Pinkston's assessment and agreed that Savat's difficulties had lasted for eleven years.  *Id*.  Milford also completed a medical source statement (mental), which indicated numerous marked limitations of functioning.  *Id*.

[13]  "[A]n ALJ may properly rely on a non-examining physician's assessment when ... those findings are based upon a careful evaluation of the medical evidence and *do not contradict those of the examining physician*." *Carrier v. Sullivan*, 944 F.2d 243, 246 (5th Cir.1991) (quoting, *Villa v. Sullivan,* 895 F.2d 1019,1024 (5th Cir. 1990)) (emphasis added).

of the examination, but his condition as it existed more than five years before the examinations in question. As required by the regulations, the instant ALJ employed a medical advisor, a psychiatrist, to provide an opinion regarding the progression of plaintiff's mental impairment. Moreover, in *Spellman*, the Fifth Circuit remanded the matter so the Commissioner could employ a medical advisor to assist with the disability onset date determination despite a statement by an examining physician that plaintiff's mental impairment has rendered the claimant unable to work for the past five or six years,. *Spellman, supra*. There was no suggestion that upon remand, the medical advisor had to examine the claimant in order to assess the disability onset date. *Id*.

Moreover, in the case *sub judice*, there is other corroborating evidence to support the onset date as determined by Dr. Felton and the ALJ. Of paramount significance is a July 19, 2002, Appraisal Report rendered by David Atkins, Ph.D. (Tr. 238-242). During the evaluation, Savat reported no delays or deficits in his social-adaptive functioning. *Id*. He denied suicidal gestures or attempts. *Id*. Although he frequently cleared his throat in a tic-like fashion, he otherwise displayed normal psychomotor activity. *Id*. His speech content was adequate. *Id*. He displayed dysphoric mood and his affect was mildly constricted. *Id*. His immediate and sustained concentration were adequate. *Id*. He read at an eighth grade level, and his math skills were at the sixth grade level. *Id*. Atkins diagnosed low-average cognitive and academic abilities. *Id*. His "verbal report strongly suggested dysthymic as opposed to a major mood disorder." *Id*. His prognosis was fair. *Id*. Atkins recommended vocational training and an opportunity for regular employment as deemed appropriate by a physician. *Id*.

Atkins' diagnosis for dysthymic disorder is significant because by definition, a dysthymic disorder is "characterized by chronic, *less severe depressive symptoms* that have been present for

15

many years." *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, DSM-IV, pg. 348 (emphasis added). Moreover, other than occasional visits to a priest, there is no evidence that Savat sought treatment for a mental impairment during the relevant period. (*See*, Tr. 622).[14] In fact, plaintiff testified that he did not receive any mental health treatment during the relevant period. (Tr. 59).

Savat's medical records confirm that his mental health began to decline after his private disability insurer ceased paying benefits in April 2001. (Tr. 245). Progress notes from Savat's hospitalization in February 2003, reflect that his wife was concerned that depression was becoming *increasingly worse*. (Tr. 295) (emphasis added). Upon admission, on February 21, 2003, Savat stated that he had been under stress for *two years*. (Tr. 318) (emphasis added). His depression was worsening. *Id*. Progress notes from February 23 and 28, 2003, indicate that Savat was not gravely disabled. (Tr. 287, 292). After his hospital discharge in 2003, records indicate that plaintiff did not take his medication regularly. (Tr. 363). Dr. Richie indicated that somatization disorder was a consideration. *Id*. Richie noted that Savat was worried about the possibility of not obtaining Social Security and becoming destitute. *Id*.[15]

In sum, the record contains substantial evidence to support a finding that Savat's mental health did not begin to decline until his private disability provider withdrew his eligibility for

---

[14] There is evidence of treatment for a mental impairment in 1986-1987. (Tr. 381-386). Again, however, he was diagnosed with dysthymic and adjustment disorders, rather than depression. *Id*.

[15] In January-February 2004, two of Savat's treating mental health providers, John Richie, M.D., and Alton McKnight, Ph.D., completed psychiatric review techniques and medical source statements indicating marked or extreme limitations of functioning in multiple areas. (Tr. 348-361, 366-379). However, they specifically limited their assessments to Savat's condition beginning in 2003. *Id*.

benefits in April 2001. The mental health examination that most closely trailed the relevant period recognized symptoms and a diagnosis considerably less severe than his deteriorated state less than one year later. Again, the medical records reflect that the flashpoint for Savat's mental health slide was his loss of private disability benefits. Unfortunately, by that point, Savat was no longer insured for Title II disability insurance benefits under the Act.

### III. Step Five

With the assistance of a VE, the ALJ concluded at Step Four of the sequential evaluation process that Savat was unable to return to his past relevant work. (Tr. 35, 37). Accordingly, he proceeded to Step Five. At this step, the ALJ determined that plaintiff was an individual closely approaching advanced age, with a high school education, and no transferable skills. (Tr. 35, 37). Relying upon VE testimony, the ALJ found that Savat was capable of making an adjustment to perform other jobs that exist in significant numbers in the national economy. (Tr. 36-37).[16]

Plaintiff contends that the ALJ's finding that he had a high school education is unsupported by the record because testing confirmed that he read at an eighth grade level and performed math skills at a sixth grade level. (*See*, Tr. 241). In response, the Commissioner seems to suggest that the fact that a claimant obtained a high school diploma is dispositive. However, the regulations provide that the "numerical grade level that you completed in school may not represent your actual educational abilities. These may be higher or lower." 20 C.F.R. § 404.1564(b). If there is no contradictory evidence, then the Commissioner will use the claimant's numerical grade level to determine educational abilities. *Id*.

---

[16] The VE identified general clerk and administrative clerk as representative jobs that plaintiff could perform. (Tr. 36, 18, 274-275).

Here, there is contradictory evidence. Moreover, if the ALJ overstated plaintiff's educational abilities, then this arguably tainted his hypothetical to the VE.[17] Nonetheless, any error was harmless because the testimony solicited from a VE at a prior hearing was premised upon a hypothetical comprised of vocational factors consistent with Savat's circumstances, including the ability to read at an eighth grade level and marginal math skills at the fourth grade level. (Tr. 119-120).[18] Despite these vocational factors and various hypotheticals which incorporated physical and mental limitations more restrictive than those ultimately adopted by the instant ALJ, the VE identified jobs that exist in significant numbers in the national economy that the hypothetical claimant could perform. (Tr. 119-132).[19]

## IV. Conclusion

The ALJ was tasked with determining Savat's residual functional capacity for the period prior to January 1, 2001. In so doing, he considered the scant medical record from the relevant period, and other evidence. The evidence was not uniform, and it could have supported a different outcome. However, the ALJ ultimately grounded his decision upon examinations or evaluations that were most connected temporally to the relevant period. Such conflicts in the

---

[17] In fact, there is no indication that ALJ Bundy's hypothetical to the VE included any vocational considerations at all. (*See*, Tr. 76-84).

[18] The hypothetical contemplated a claimant even older than Savat's age during the relevant period. (Tr. 119).

[19] Two representative jobs identified by the VE at the unskilled, light exertional level included cashier II and ticket seller. (Tr. 121). There are approximately 3,100 jobs for each title in Louisiana. *Id*. These jobs constitute a significant number of jobs in the "national economy." 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).
.

evidence, including conflicting medical opinions, are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted). This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) (citations and internal quotation marks omitted). That is not to say that the ALJ's decision is blemish-free, but procedural perfection in the administrative process is not required, and any errors do not undermine confidence in the decision.

For the foregoing reasons, the undersigned finds that the Commissioner's decision is supported by substantial evidence and remains free of legal error. Accordingly,

The Commissioner's decision is **AFFIRMED**, and the matter **DISMISSED** with prejudice.

THUS DONE AND SIGNED at Monroe, Louisiana, this 5th day of March, 2009.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE